Lou POLLER, Appellant

v.

COLUMBIA BROADCASTING SYSTEM, INC., et al., Appellees.

No. 15379.

United States Court of Appeals District of Columbia Circuit.

Argued May 23, 1960.

Decided Nov. 10, 1960.

Washington, Circuit Judge, dissented.

Mr. Abraham L. Freedman, Philadelphia, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Mr. George R. Beneman, Washington, D. C., was on the brief, for appellant. Mr. Wm. Montgomery Smith, Washington, D. C., also entered an appearance for appellant.

Mr. Samuel I. Rosenman, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Leon R. Brooks, Washington, D. C., was on the brief, for appellees.

Before WILBUR K. MILLER, Chief Judge, and PRETTYMAN and WASHINGTON, Circuit Judges.

WILBUR K. MILLER, Chief Judge.

This is a civil suit for threefold damages under Section 4 of the Clayton Act* brought by the appellant, Lou Poller, against the appellee, Columbia Broadcasting System, and others. He charged them with combining and conspiring to restrain trade and commerce in the television industry in violation of Section 1 of the Sherman Act,** and with monopolizing and attempting to monopolize trade and commerce in that industry in violation of Section 2 of the Sherman Act,† and alleged he had thereby been injured in his business and property.

* 15 U.S.C.A. § 15.

** 15 U.S.C.A. § 1.

† 15 U.S.C.A. § 2.

Poller sued as assignee of Midwest Broadcasting Company, a dissolved corporation of which he had been president and in which he had been the dominant figure. Midwest had been the owner and operator of a UHF television broadcast station in Milwaukee from the time of construction in 1953 until February 27, 1955. Poller claimed CBS, in violation of the antitrust laws, had conspired with others to acquire his station at a price below its actual value. He states the basis of his suit as being that the alleged conspirators frustrated the efforts of others to acquire his station, secretly obtained an option on a competing station, and then cancelled the affiliation agreement CBS had had with Midwest. As a result of what he calls "this three-pronged maneuver," Poller says the conspirators purchased his equipment from him at a price far less than its real value, although he admits the purchase was "on plaintiff's entreaty."

More specifically, the facts are these: Under a construction permit granted February 4, 1953, Midwest Broadcasting Company began the construction of a UHF television broadcast station in Milwaukee, where there was already a VHF station affiliated with NBC. On August 21, 1953, as its station neared completion, Midwest made an affiliation agreement with CBS, subject to the latter's unilateral right to cancel at any time on six months' notice.[1] A short time later Bartell Broadcasters began operating another UHF station—WOKY—in Milwaukee. The Bartell station was neither as elaborate nor as successful as Midwest's.

In January, 1954, Midwest was informed by a broker that, if and when the Federal Communications Commission adopted a multiple ownership rule which would permit George B. Storer to add a UHF station to the others owned by him, Storer would pay $2,000,000 for Mid-

west's station. About that time the latter began adding substantial improvements to its facilities.

CBS says it had faith in UHF, although general opinion in the industry was that it could not successfully compete with VHF. It therefore determined, later in 1954, to acquire a UHF station in Milwaukee, if and when the Commission should adopt the "5 and 2" rule,[2] which would permit it to do so. CBS had learned of Poller's efforts to sell the Midwest station for approximately $2,000,000 —a price it considered to be substantially more than the property was worth, and "completely out of line." Because of this, CBS chose not "to enter into any kind of trading" with Poller, but decided to attempt to acquire the other UHF station in Milwaukee. To that end, it employed one Thad Holt, an independent consultant, to obtain from Bartell an assignable option to purchase station WOKY. On July 29, 1954, Holt obtained such an option in his own name, without disclosing the identity of his principal. The option price was $335,000, which Holt said was arrived at by adding $50,000 to Bartell's investment. This option, which endured until October 1, 1954, was extended to February 1, 1955. On September 17, 1954, the Commission adopted the 5 and 2 rule, effective October 22. On October 25, 1954, Holt assigned the option to CBS, which immediately exercised it.

Meantime, on October 21, CBS notified Midwest that its affiliation agreement would be cancelled as of April 22, 1955. The day after the notice of cancellation was given, Poller flew to New York and pleaded with officials of CBS to reconsider the termination of his company's affiliation, stating he had gone to great expense for a new studio and equipment, far more elaborate than that he would have required for a station which did not have a CBS affiliation. He stated he in-

---

1. Poller "continuously" pleaded with CBS to eliminate the provision for cancellation on six months' notice, but CBS refused. Poller said he used the CBS insignia "with trepidation," because of the tenuous nature of the network affiliation.

2. An amendment to the multiple ownership rule permitting one person to own five VHF and two UHF television stations.

tended to continue television broadcasting in Milwaukee but that he would not require for that purpose the expensive equipment he had contracted to purchase.

It was suggested that CBS might protect Midwest against the loss Poller feared by purchasing the physical equipment for which it had contracted and by taking over its studio lease. CBS agreed. It took over the studio and equipment, transferred to Midwest the equipment it had bought from Bartell, and paid Midwest the sum of $500,000. Midwest acknowledged that CBS had assumed liability for the work in progress and had paid it in full for the sums it had spent. Midwest also agreed to operate its station with the equipment formerly owned by Bartell, but failed to do so.

On February 17, 1955, CBS began operating its UHF station in Milwaukee, having paid Midwest $1,000 a day for advancing the cancellation date from April 22, 1955; but on March 21, 1959, the station was closed because its operation was marginal or unprofitable.[3] Midwest ceased broadcasting February 27, 1955, and in December, 1955, its corporate existence was terminated and all its assets were transferred to Lou Poller, who had been its president and sole stockholder.

In September, 1956, Poller filed this suit in the United States District Court against Columbia Broadcasting System, CBS–TV, an unincorporated division of CBS, J. L. Van Volkenburg and H. K. Akerburg, respectively president and vice president of CBS–TV, Bartell Broadcasters, and Thad Holt. As we have said, he charged them with conspiring to acquire the Midwest station in violation of the antitrust laws and at a price below its actual value, and charged CBS with monopolization and an attempt to monopolize.

Poller prayed for damages which he computed as follows: he sold the Midwest

property, which he says was worth $2,000,000 to CBS for $500,000 and the transfer of the Bartell equipment, which he says was worth no more than $50,000; therefore he claimed damages of $1,450,-000, trebled in accordance with the statute.

After extensive filings of interrogatories, depositions and affidavits, the District Court on June 9, 1959, entered an order granting the defendants' motion for summary judgment and dismissing the complaint as to CBS, Van Volkenburg and Akerburg. The opinion of the District Court is reported at 1959, 174 F.Supp. 802. Poller appeals.

■ The first question is—assuming without deciding that Midwest received less than the fair value of its station—whether Midwest was forced to sell by anything CBS did. Poller admits that the large value he placed on the Midwest station—greatly in excess of its cost—depended upon a CBS affiliation not subject to cancellation on six months' notice. Midwest did not have such an affiliation, and from the beginning CBS had refused to grant it. Poller realized from the outset the shakiness of his position and used the CBS insignia "with trepidation." His sale to CBS was not sought by the latter. On the contrary, CBS bought Poller's equipment only at his importunity and to save him from the loss he thought he was about to suffer because he had improvidently contracted for construction of elaborate facilities which he would need only if he had the firm affiliation CBS had consistently refused to give him.

We are of the opinion that Poller's entreaty to CBS to buy his equipment was brought about by his own act of investing too heavily in the UHF equipment without having a firm network affiliation. Certainly he sought the sale and entered into it voluntarily.

3. When CBS acquired its Milwaukee station, there were two VHF stations in that market and a third went on the air thereafter. The result was that CBS was operating the only UHF station in the nation which was in competition with three VHF stations in the same market.

If it be assumed, however, that Poller was forced to sacrifice his station by the acts of the alleged conspirators, other questions remain. Was there a conspiracy? If so, did the acts of the conspirators restrain trade or commerce in the television industry?

■■ We turn to a consideration of the first of these questions: Did CBS and the individual appellees enter into a conspiracy in restraint of trade or commerce among the several States? The purpose of Section 1 is to prohibit joint action of two or more persons in combining their economic power and restricting competition. Poller's charge that CBS conspired with one of its unincorporated divisions and two of its employees is obviously unsound. It is in reality a charge that CBS conspired with itself. As the Fifth Circuit said in Nelson Radio & Supply Co. v. Motorola: [4]

"* * * It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation. * * * [A] corporation and its subsidiaries can be guilty of a conspiracy in restraint of trade but that involves separate corporate entities. * *"

■ We conclude that CBS, its unincorporated division, and its employees were incapable of conspiring to restrain trade or commerce. The question becomes, then, whether CBS conspired with Bartell Broadcasters or Thad Holt to accomplish that purpose. Bartell and Holt are not now parties: the complaint was dismissed by the court as to the former upon its suggestion of improper venue, and the latter was never served with process.

The record shows Bartell gave an option to Holt without knowing he was acting for CBS, and did nothing more than sell its station as it was required to do by the option. Holt knew nothing of Poller or his station, and merely acted as agent for CBS in obtaining the Bartell option. In short, the record shows Bartell and Holt did not enter into a concerted scheme with CBS, but that the latter alone conceived and consummated the plan of acquiring the UHF station in Milwaukee which had been competing with Midwest.

Even if it be thought that Bartell and Holt combined with CBS to accomplish a common purpose, it does not seem to us that the purpose was to restrain trade or commerce. Poller complains that CBS cancelled Midwest's affiliation. It had the contractual right to do that. He complains that CBS chose to buy the Bartell station instead of his own. Certainly CBS did not act illegally in making that choice; it was under no sort of obligation to buy the Midwest station.

■ Then, when CBS saved him from the loss he might have suffered had he been left with the expensive facilities he had bought to meet a network affiliation he did not have, Poller complains he was forced by CBS to make a sacrificial sale. But his real complaint is that CBS would not eliminate the six months' cancellation clause from his affiliation agreement. He had never been led to believe this would be done; on the contrary, CBS had consistently refused to do it. Nevertheless, despite his "trepidation," Poller recklessly proceeded to incur large liability for expanded facilities he knew he would not need without the affiliation which had been continuously denied him.

It was said in United States v. Colgate & Co., 1919, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992:

"* * * In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discre-

---

4. 1952, 200 F.2d 911, 914, certiorari denied 1953, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356.

tion as to parties with whom he will deal * * *."

The Supreme Court has not departed from this rule, which has since been applied to broadcasting networks. In Federal Broadcasting System v. American Broadcasting Co., 1948, 167 F.2d 349, 351, certiorari denied 335 U.S. 821, 69 S.Ct. 43, 93 L.Ed. 375, the Second Circuit said:

> " * * * The principal ground urged in support of the charge of a boycott as a basis for the temporary injunction is that by concerted action the American and Mutual networks have cancelled their existing arrangements with the plaintiff. However, each did this pursuant to the terms of its agreement, and it is clear that if these defendants really acted individually and not jointly they wêre within their rights. A network is not a common carrier and each therefore had the right in the absence of concerted action to make such contracts for the distribution of its programs as it chose. * * "

■ We conclude from the foregoing that the acts done by CBS and its co-defendants did not restrain trade or commerce. Hence, any injury tô Poller's business and property caused by those acts was not the result of a violation of Section 1 of the Sherman Act.

■ The next question is whether CBS monopolized any part of the trade or commerce among the several States.[5]

As we have seen, CBS cancelled its affiliation with Midwest, bought the Bartell UHF station, later traded the Bartell equipment for that of Midwest, and also paid a large cash consideration, and then attempted to operate a UHF station in Milwaukee but failed and closed the station. These acts do not manifest an attempt to monopolize any part of the trade or commerce in the television industry. There was no attempt to monopolize UHF in Milwaukee, for Poller expressly said he would continue to operate there with the less elaborate Bartell equipment which would be sufficient for operation without a CBS affiliation. He accepted the Bartell equipment for that purpose. The failure of UHF in Milwaukee seems to have been due to the superiority of the VHF competition.

Poller argues that each of the three national television networks—American Broadcasting Company, CBS and National Broadcasting Company—has a "vertical" monopoly, despite the fact they are fiercely competitive.[6]

5. It has already been shown that CBS did not combine or conspire with any person or persons to do the acts which are the basis of Poller's complaint. Hence it did not "combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." So, the question is limited, as stated in the text above, to the question whether CBS itself monopolized any part of the trade or commerce among the several States, or attempted to do so.

6. This notion is thus expressed in Poller's brief:
"It is a vital fact that because of physical limitations a particular station can broadcast only one program at a time, and because programs can only be received on a particular set one at a time there is an automatic exclusion by each program of all others at that time.
"Accordingly, the broadcast of a network program results in a vertical monopolization of every station throughout the country which receives and transmits that program at the time it is broadcast. The case is no different than it would be if because of physical law three concerns doing the same thing could reach into only one of three separate areas of space. In a sense, they would be competing with each other. But it is equally true that each of them would have an exclusive monopoly in the *entire* area that it could *possibly* embrace. It is no less a monopolization by any one merely because there is another outside area unapproachable by it, in which others likewise hold exclusive sway.

  *  *  *  *  *

"In the great majority of markets where there are more than two stations each network requires that the station which takes its programs must become in effect its exclusive *station*. Thus, by the coercive power of its programming the network has accumulated what it calls a chain of affiliated stations.

The appellant says that, because a particular station can broadcast only one program at a time and only one program at a time can be heard on a receiving set, the broadcast of a network program results in vertical monopolization of every television station in the nation which receives and transmits it. This is the result of physical laws, and cannot be said to be monopolization by CBS or either of the other two networks.

Appellant goes on to argue that "In the great majority of markets where there are more than two stations each network requires that the station which takes its programs must become in effect its exclusive station"; that "The network does even more; it ties the stations to affiliation agreements which give the network exclusive control, yet keeps them dangling by the provision under which it can at will terminate the franchise upon which their financial fate depends."

Poller asserts that the power of CBS to own and operate television stations is "a potent monopolistic weapon." He characterizes it as an "element in the chain of monopoly practice." This power, he says, is "a potential threat against every station in the country." He expresses the belief "that, notwithstanding commission sanction,[7] the ownership of stations by networks effects such a concentration of control in the television industry as is violative of the antitrust laws."

Whether appellant's assertions are valid is not before us. Nor are we called on to review the 5–2 regulation. Rather, the question is whether, by the exercise of the right to acquire the Bartell station and the Poller equipment, CBS monopolized or attempted to monopolize interstate trade or commerce in the television industry; and, if so, whether Poller is thereby injured in his business or property. We perceive no monopoly or attempt to monopolize but, instead, an unsuccessful attempt to compete with other Milwaukee stations. For, after the Bartell acquisition, CBS had competition in Milwaukee from both VHF and UHF stations, and after acquiring Poller's equipment its station continued to have VHF competition to which it finally yielded. Of course, the competitive situation among the networks continued as before.

■ Assuming, however, (without deciding) that by either acquisition CBS was monopolizing or attempting to monopolize, we are of the opinion, for reasons stated elsewhere in this opinion, that Poller was not thereby injured in his business or property. Such injury as he may have sustained, we repeat, was caused by his improvidence in contracting for elaborate equipment to meet the requirements of a firm affiliation he knew he did not have.

Such is the monopolization with which CBS is charged. The essence of it is that the network keeps the stations "dan-

These affiliates are no part of the network's investment of money or management. Others have made the investment; others have the burden of management; others run the risk of loss. But by virtue of the network having the program to sell, it requires by contract that these stations become in effect its subsidiaries. Thus, by an ironic perversion of the circumstances, the supplier dominates the customer. The network does even more; it ties the stations to affiliation agreements which give the network exclusive control, yet keeps them dangling by the provision under which it can at will terminate the franchise upon which their financial fate depends."

7. The Commission sanction to which Poller refers is the 5–2 regulation of the Federal Communications Commission permitting one concern to own as many as, but not more than, five VHF and two UHF stations. The Commission has thereby held in effect that a network's ownership of that small number of stations is not against the public interest. As monopolization or an attempt to monopolize any part of trade or commerce among the several States is contrary to the public interest, the effect of the expert Commission's regulation is that such limited multiple ownership of facilities in the field it regulates does not violate Section 2 of the Sherman Act. Much weight should be given, we think, to the Commission's holding.

gling" because of the provision it can cancel the franchise at will. That is to say, CBS is charged with monopolizing or attempting to monopolize some part of trade or commerce in the television industry because it kept Midwest "dangling" by retaining the right to terminate its affiliation on six months' notice. The retention of the right to cancel was lawful, and Midwest agreed to it.

All affiliation agreements between networks and stations are for fixed and limited terms, just as are station licenses granted by the Federal Communications Commission, but Poller does not claim this produced monopoly, even though the network is under no obligation to renew. It is the right of cancellation retained by CBS which he says kept his station "dangling." Although he was unhappy about it, Poller knowingly accepted affiliation subject to cancellation on six months' notice, as he could do no better. We see no reason for him to complain that the option to cancel was exercised.

Whether or not Packard Motor Car Co. v. Webster Motor Car Co., 1957, 100 U.S. App.D.C. 161, 243 F.2d 418, is dispositive here, as the District Court held, that case is certainly relevant and indicative of the applicable doctrine. Several dealers in Baltimore had one-year contracts with Packard to sell its cars in that area. One of them informed Packard he would not continue as dealer unless he were granted an exclusive agency. Packard agreed, and refused to renew the franchises of the other dealers. One of them sued Packard for triple damages, alleging the transaction constituted a conspiracy in restraint of trade in violation of the Sherman Act. We held there was no contract or conspiracy to restrain trade within the meaning of the Sherman Act.

We have noted appellant's argument that the national networks have coercive and restrictive practices which extend the monopoly he asserts they have. These practices are: (1) the "must buy" policy which requires advertisers to buy time on a designated group of stations; (2) the "option time" practice under which affiliates contract to accept and broadcast all network programs offered to them during designated hours of the broadcast day.

We need express no opinion regarding these practices because it does not appear that either played any part in causing the injury to the business and property of Poller, of which he complains.

In sum, we hold the record shows there was no illegal conspiracy to restrain trade or commerce among the several States, that no restraint of such trade or commerce appears, and that no monopoly or attempt at monopoly was shown.

Affirmed.

WASHINGTON, Circuit Judge (dissenting).

Poller's suit charges a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and a monopoly, attempted monopoly, or conspiracy to monopolize trade in violation of Section 2 of that Act. The District Court, without deciding whether the Sherman Act had been violated, gave summary judgment against Poller on the ground that his admitted injuries were *damnum absque injuria*, since CBS had a contractual right to cancel Poller's affiliation agreement and a legal right to choose to buy a rival station and to give that station (i. e., itself) the CBS affiliation. The majority of this court would affirm on the ground, as I understand it, that there was as a matter of law, on the record here, neither a conspiracy in restraint of trade nor a monopoly or attempted monopoly.

I disagree. In my view, Poller raises genuine issues of material fact as to whether there was a conspiracy against him in restraint of trade and a monopoly. The charges he makes may, of course, appear ultimately to be without foundation in fact. But I think he is entitled to an opportunity to attempt to establish his charges before a jury, and that it was error to give summary judgment against him. Where the propriety of a summary judgment is involved, we are required, of course, to look at the case in the light most favorable to the plaintiff. Callaway v. Hamilton National Bank, 1952, 90 U.S. App.D.C. 228, 195 F.2d 556.

1. Poller's allegation of conspiracy does not relate to the Columbia Broadcasting System (CBS) alone. It includes an unincorporated wholly-owned subsidiary, CBS–TV, two officers of CBS–TV, and other persons. It is clear that corporate officers can be members of a conspiracy with their corporation. The Supreme Court has so held. Schine Chain Theatres v. United States, 1948, 334 U.S. 110, 116, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Yellow Cab Co., 1947, 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010. The same cases establish that a corporation may violate the Sherman Act by conspiring with its wholly-owned subsidiaries. See also United States v. Radio Corporation of America, 1959, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed. 2d 354; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219. In my view, CBS could conspire with CBS–TV, a wholly-owned, but not incorporated, "division"—as separate and distinct an organization as a wholly-owned subsidiary. Since there were other alleged co-conspirators, it is unnecessary, however, to rely on that ground. The outside persons, included as conspirators in plaintiff's charges, are not ruled out as possible conspirators merely because they are not presently defendants in this suit. A plaintiff is not required to sue and obtain judgment against every conspirator at his peril. Nor do I think that it is clear here, as do the majority, that these others were not conspirators. Whether or not they were is in issue, and the issue can only be resolved by proof.

2. In general, of course, a corporation may, without legal liability, deal with persons of its choice and exercise the rights given it by its contracts. But clearly one of the qualifications to the free exercise of these rights is that they may not be used in a way which amounts to a conspiracy to restrain or to monopolize trade among the states. See United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 36–47, 80 S.Ct. 503, 4 L.Ed.2d 505.

Packard Motor Car Co. v. Webster Motor Car Co., 1957, 100 U.S.App.D.C. 161, 243 F.2d 418, certiorari denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38, is not dispositive here. Upon loss of its franchise to sell Packard automobiles, the retail dealer involved could use its properties in a variety of ways, including the sale of other automobiles in competition with the Packard automobile. But a TV station operator can make only one use of his property, and, as will appear, without a network affiliation the property cannot be as profitably used, and the business may fail in consequence. Thus, the economic impact of CBS' action in cancelling Poller's network affiliation and buying the competing UHF station was highly damaging in a competitive sense. Furthermore, the Packard Company did not itself invade the retail market. Here CBS, primarily a wholesaler of programs, has entered the retail field.[1]

3. The essence of a violation of Section 1 of the Sherman Act is an unreasonable injury to, or restraint on, competition in a particular market in interstate commerce. Involved in this case are competitive interactions in three primary markets. First, there is the market in which television stations are bought and sold by station operators and entrepreneurs. Second, there is the local television broadcasting market in which viewers in particular areas accept or reject programs offered over local broadcasting stations. Although station profits do not come directly from payments by viewers, it can be fairly said that individual station operators compete for audiences which they are in effect able to sell to

---

1. For similar reasons, the other "refusal to deal" cases are equally inapplicable here. See, e. g., United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992; Schwing Motor Co. v. Hudson Sales Corp., D.C.D.Md., 138 F.Supp. 899, affirmed 4 Cir., 1956, 239 F.2d 176, certiorari denied 1957, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38. Colgate was of course severely limited in the Parke, Davis & Co. case, supra, if not sent "to its demise." See Mr. Justice Harlan dissenting, 362 U.S. at page 49, 80 S.Ct. at page 514.

national and local advertisers. Third, there is competition among program producers for national advertisers. While local station owners may on occasion independently produce programs which merit the attention of advertisers seeking nationwide audiences, it is generally true that the three great television networks are the chief competitors for advertisers seeking national program audiences. Poller says—and it seems reasonably clear on this record—that television stations in Milwaukee, especially UHF stations, cannot operate profitably without a network affiliation.

Through its operating division, CBS–TV, CBS is a primary producer of nationally broadcast television programs. While CBS owns several transmitting stations, CBS programs are generally presented to the viewing public over independently owned stations from which CBS obtains the right to use choice air time by means of affiliation agreements. At one time CBS–TV used the facilities of Poller's UHF station in Milwaukee under a network affiliation agreement. The present dispute arises because CBS–TV obtained an option to purchase the only competing UHF station in Milwaukee when it knew Poller's station was for sale, exercised its contract right to cancel Poller's network affiliation and then purchased Poller's equipment by giving him cash plus the poorer equipment of the Bartell station on which the option had been obtained. At the end CBS–TV had eliminated both Poller and Bartell from UHF telecasting in Milwaukee and it remained as the only telecaster in that field.[2] Competition in the entire market, comprising both UHF and VHF, was reduced.

The allegation that this was accomplished through a conspiracy has been denied and the question is in issue, subject to proof. It is further claimed by Poller that CBS was the only network willing to give relatively equal consideration to affiliation with UHF or VHF stations; that as a result, CBS had great effect on the entry or continued existence of UHF stations in the various local broadcast markets; and that by waiting for Poller and Bartell to develop the UHF market in Milwaukee and then using its economic and contractual power to establish itself in Milwaukee in their stead, CBS must have seriously discouraged new UHF operations elsewhere, for few entrepreneurs would be willing to pioneer a new field only to have the fruits of success taken from them by a network, without compensation. It is also claimed that the actions of CBS caused Poller's franchise to be reduced in value and his equipment to become useless and unmarketable elsewhere, and that CBS paid an unreasonably low price for his equipment.

In my view, the purchase and operation of the Bartell station as the exclusive CBS outlet in Milwaukee was an illegal restraint on competition if it forced Poller to go out of business under circumstances whch discouraged or actually precluded the entry of new UHF stations into the Milwaukee TV market and other TV markets, thereby seriously retarding the development of the entire television industry.[3] Likewise, I think that the elimination of Poller in the way claimed could be deemed to be an elimination of competition by unfair means, an abuse which the antitrust laws were intended to preclude. National Biscuit Co. v. Federal Trade Commission, 2 Cir., 1924, 299 F. 733, 738; United States v. Klearflax Linen Looms, Inc., D.C.D.Minn.1945, 63 F. Supp. 32. If Poller can prove these things to the satisfaction of a jury, I think he would be entitled to a verdict. He should be given that chance. On a motion for summary judgment the courts should be reluctant to deny the plaintiff

---

2. Whether or not CBS desired that result is a question of fact to be determined at a trial. In a case like the present, however, specific intent to restrain trade or monopolize may be unnecessary. See United States v. Griffith, 1948, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236.

3. Had CBS merely cancelled Poller's affiliation and given an affiliation contract to another independent Milwaukee station, it may be that no competitive evils would have resulted.

his day in court when he alleges that he was forced out of business as a result of a conspiracy to eliminate him as a competitor. See Slick Airways, Inc. v. American Airlines, Inc., D.C.D.N.J.1951, 107 F.Supp. 199, 214, appeal dismissed, 3 Cir., 1953, 204 F.2d 230, certiorari denied, 1953, 346 U.S. 806, 74 S.Ct. 54, 98 L.Ed. 336. And this would seem particularly true where (as here) it is charged that the public has been deprived of maximum television service by a reduction of competition. See Packaged Programs, Inc. v. Westinghouse Broadcasting Co., 3 Cir., 1958, 255 F.2d 708.

My view is based in part upon United States v. Radio Corporation of America, 1959, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed. 2d 354. There the United States asserted that RCA and its wholly-owned subsidiary NBC had threatened to cancel the NBC program affiliations of certain Westinghouse-owned stations, unless Westinghouse agreed to exchange its Philadelphia TV station for one owned by NBC in Cleveland, plus cash. The exchange was made and NBC was enabled to enter a new market area. The District Court granted summary judgment for RCA on the theory that the United States was precluded from bringing an antitrust action because the Federal Communications Commission had approved the challenged transaction. D.C.E.D.Pa. 1958, 158 F.Supp. 333. The Supreme Court repudiated this theory, and reinstated the complaint. Although the Supreme Court did not expressly characterize as illegal the actions of RCA, its reversal of the District Court would appear to mean that the complaint adequately stated a cause of action. If the plaintiff's allegations are proved, the present case differs only in that CBS did not openly threaten Poller. If the actions of CBS in fact had an irresistibly coercive effect on Poller, the absence of an overt threat would not be significant, and Poller's claim seems to be even stronger than that of Westinghouse, since here, unlike its case, the result of the CBS transaction was to reduce TV competition in the particular market area involved.

4. Similarly, Poller would be entitled to recover under Section 2 of the Sherman Act if he can prove, as he claims, that CBS had power to exclude him and other competitors in Milwaukee, and intended to use that power. See United States v. Griffith, 1948, 334 U.S. 100, at page 107, 68 S.Ct. 941, at page 945, 92 L.Ed. 1236. "It is the exclusion of others from the opportunity of doing business that is regarded as monopolizing." National Biscuit Co. v. Federal Trade Commission, supra at page 738 of 299 F.

The present record suggests that it may appear, if proof were offered, that once CBS had purchased Bartell's station, it had absolute power to exclude other independent UHF operators from Milwaukee so long as the other networks did not alter their attitudes toward UHF. Certainly, there are substantial indications that CBS had monopoly power over UHF in Milwaukee at the time it cancelled Poller's affiliation. Although CBS' station was in competition with Milwaukee VHF stations for viewers and thus not a monopolist in the viewer market, it may well be that CBS' economic strength gave it virtual monopoly power over the entry of new stations into Milwaukee. The possibility of new VHF entrants into Milwaukee may have been closed for practical purposes (apparently the third and last VHF channel in Milwaukee went into operation shortly after CBS entered Milwaukee). And by lowering local advertising rates or being able to do so, CBS may have been able effectively to preclude the entry into Milwaukee of new UHF independents who were simultaneously faced with the reluctance of other networks to affiliate with them. Proof of such facts would, I think, support a verdict in Poller's favor.

In reaching my conclusions as to both Sections 1 and 2, I have not failed to note that with respect to each of the claimed violations CBS made factual allegations which if proved might warrant a judgment in its favor, and that proof of Poller's claims will not be easy. But I think that he is entitled to go to trial.