HAWAIIAN OKE & LIQUORS, LTD.,
Plaintiff,

v.

JOSEPH E. SEAGRAM AND SONS, INC., the House of Seagram, Inc., McKesson & Robbins, Inc., Barton Distilling Co., and Barton Western Distilling Co., Defendants.

Civ. No. 2418.

United States District Court
D. Hawaii.

July 24, 1967.

Vernon F. L. Char, Damon & Shige-kane, Honolulu, Hawaii, Joseph L. Alioto, Maxwell M. Blecher, San Francisco, Cal., for plaintiff.

J. Garner Anthony, Robertson, Castle & Anthony, Honolulu, Hawaii, Thomas Kiernan, White & Case, New York City, for defendants, Joseph E. Seagram and Sons, Inc. and The House of Seagram, Inc.

Martin Anderson, George W. Ashford, Jr., Anderson, Wrenn & Jenks, Honolulu, Hawaii, for defendant, McKesson and Robbins, Inc.

Herbert Y. C. Choy, Fong, Miho, Choy & Robinson, Honolulu, Hawaii, Fred R. Mardell, Chicago, Ill., for defendants, Barton Distilling Co. and Barton Western Distilling Co.

## MEMORANDUM DECISION AND RULING ON PLAINTIFF'S REQUESTED INSTRUCTION NUMBER 36 CONCERNING POSSIBLE INTRACORPORATE CONSPIRACY

MARTIN PENCE, Chief Judge.

Plaintiff Hawaiian Oke & Liquors, Ltd. (Hawaiian Oke) brought this action to recover treble damages under Section 4 of the Clayton Act (Title 15 U.S.C. § 15) for injury allegedly resulting from defendants' violations of the antitrust laws. Hawaiian Oke contended it was damaged by a "combination * * * or conspiracy, in restraint of trade" among the following entities, which eliminated plaintiff from the wholesale liquor distribution business contrary to the provisions of the Sherman Act (Title 15 U.S.C. § 1):

Joseph E. Seagram & Sons, Inc. (Joseph Seagram);

Calvert Distillers Company (Calvert), a division of House of Seagram, Inc. (House of Seagram);

Four Roses Distillers Company (Four Roses), a division of House of Seagram;

Frankfort Distillers Company (Frankfort), a division of House of Seagram;

McKesson & Robbins, Inc. (McKesson);

Barton Distilling Company (Barton); and

Barton Western Distilling Co. (Barton Western), a wholly-owned subsidiary of Barton.

Calvert, Four Roses and Frankfort are unincorporated divisions of House of Seagram, which in turn is a wholly-owned subsidiary of Joseph Seagram.

Pre-Trial Order No. 1 required the parties to file proposed jury instructions

for the court's consideration.[1] Plaintiff's requested Instruction No. 36 provided that each of the unincorporated divisions of House of Seagram here involved "should be treated as a separate corporation for purposes of determining" whether there had been a violation of the antitrust laws.[2] Defendants objected that the requested instruction did not accurately state the law. After briefing [3] and oral argument [4] the court ruled on April 20, 1967 that it would give an instruction which contained the substance of plaintiff's number 36. Following is the text of the instruction given the jury on April 25, 1967:

### "PLAINTIFF'S REVISED INSTRUCTION NO. 36

"Calvert Distilling Co., Four Roses Distilling Co. and Frankfort Distilling Co. were each separate unincorporated divisions of the defendant House of Seagram, Inc. at the time that each terminated dealings with Hawaiian Oke.

"Each of these divisions of defendant House of Seagram, Inc., shall be treated by you as separate entities for the purpose of determining whether or not there has been a combination or conspiracy, as I have heretofore defined those terms, to terminate Hawaiian Oke as their respective distributor. For the purpose of returning a verdict, however, you will consider these divisions as being the defendant House of Seagram, Inc."

This memorandum sets forth the basis of the court's April 20, 1967 ruling.

## I. THE LEGAL AUTHORITIES

### A. BASIC PRINCIPLES OF ANTITRUST LAW

The legal question here presented for determination is one of first impression.

Previous courts have considered whether corporate subsidiaries of a single parent can conspire among themselves and/or with the parent, or whether unincorporated divisions may conspire vertically with the "parent" body. But no recorded opinions have dealt with an alleged horizontal conspiracy among the unincorporated divisions of a single corporation. In analyzing this question the court believes some consideration of the aims and purposes of the antitrust laws is necessary to put the issue in context.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce * * * is * * * illegal". This broad language was interpreted by the Supreme Court in its seminal opinion in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), where the Court dismembered the Standard Oil petroleum combine. In construing the Sherman Act Mr. Chief Justice White reviewed the legal history of the language employed by Congress and concluded that Section 1 is "an *all-embracing* enumeration to make sure that *no form* of contract or combination by which an undue restraint" [5] of interstate commerce is achieved can be saved from condemnation. (Emphasis added.) The court then enunciated the "rule of reason" to guide each court's discretion in determining whether "in a *given case, a particular act* had or had not brought about the wrong against which the statute provided." (Emphasis added.) [6] In applying these principles the court is concerned only with the acts complained of and their results. The judiciary is entrusted with protection of the broad public policy favoring competition, and "every" act,

1. Pre-Trial Order No. 1 (filed January 20, 1967), p. 5, para. 9(c).

2. The parties agreed that for the purposes of this litigation Barton and its wholly-owned subsidiary Barton Western should be treated as a single entity.

3. Seagram's Objections to Plaintiff's Instructions and Memorandum (filed April 4, 1967) pp. 2-4, and Plaintiff's Memorandum in Support of Plaintiff's Proposed Jury Instruction No. 36 re Divisions of The House of Seagram, Inc., (dated April 19, 1967).

4. Transcript of Proceedings (TR.), April 19, 1967.

5. 221 U.S. at 59, 31 S.Ct. at 515.

6. Id. at 60, 31 S.Ct. at 516.

whether its form be new or old, which unduly interferes with the interstate flow of commerce is proscribed.

## B. DEFENDANT'S POSITION

Briefly stated defendant's position is that as a matter of law a corporation cannot conspire with itself through its unincorporated divisions. The House of Seagram has relied upon the following decisions to support its view, none of which are directly on point: Poller v. Columbia Broadcasting System, Inc., 109 U.S.App. D.C. 170, 284 F.2d 599 (1960), reversed on other grounds 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Deterjet Corp. v. United Aircraft Corp., 211 F. Supp. 348 (D.Del.1962); Kemwel Automotive Corp. v. Ford Motor Co., 1966 Trade Cases at para. 71, 882 (S.D.N.Y. 1966); Johnny Maddox Motor Co. v. Ford Motor Co., 202 F.Supp. 103 (W.D. Tex.1960); and Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911 (5th Cir. 1952), cert. denied 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).[7]

In *Nelson Radio,* supra at 914 (a treble-damage action for restraint of trade in communication equipment), the alleged conspirators were the defendant corporation and its officers, employees, representatives and agents. However, there is no allegation that either a corporate subsidiary or division participated. The appellate court affirmed dismissal for failure to state a cause of action:

"It is basic in the law of conspiracy that you must have two persons or *entities* to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." (Emphasis added.)

Each of the four other decisions advanced by defendant as authority for its position involve claims that a corporation and an unincorporated division thereof conspired in violation of the Sherman Act. The allegation in *Poller,* supra, was that the Columbia Broadcasting System joined with CBS-TV, an unincorporated division,[8] and others, to acquire plaintiff's television station at a price below its actual value. The charge in *Deterjet,* supra, was that United Aircraft Corp. combined with Pratt & Whitney Co., its division, and others, to preclude plaintiff from marketing its product (used in regulating the operation of aircraft propellers), which was allegedly an improvement upon, and in competition with defendant's product. In *Kemwel,* supra, plaintiff asserted that Ford Motor Co. and Ford International, an unincorporated division, conspired to monopolize the export of Ford automotive parts and accessories. The claimed conspiracy in *Johnny Maddox Motor Co.,* supra, was among Ford Motor Company, its divisions, and others, to discriminate against plaintiff (a franchised automobile distributor) in purchase price, and merchandise and services provided. In each of these actions the court granted motions for dismissal or summary judgment insofar as the complaints recited claims of conspiracy between a corporation and its unincorporated division. And in each of these decisions the courts relied upon the above quoted passage from *Nelson Radio,* supra. However, this court does not feel that the broad principle of law taken from *Nelson,* and applied unswervingly in *Poller, Deterjet, Kemwel,* and *Johnny Maddox,* is controlling of the instant factual situation. Even as enunciated in *Nelson,* the principle that a corporation cannot conspire with itself does not preclude divisions from being legally capable of conspiring. As quoted above, "you must have two

---

7. Defendant might also have pointed to Timken Roller Bearing Co. v. United States, 341 U.S. 593, 606, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (dissenting opinion of Justice Jackson) and Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) p. 35.

8. The Supreme Court specifically reserved the question whether a corporation and a division thereof are legally capable of conspiring, and reversed the appellate court on other grounds. 368 U.S. 464, 469, n. 4, 82 S.Ct. 486.

\* \* \* entities to have a conspiracy." The interpretation given this concept to date, when related to divisions, is that a corporation and an unincorporated division thereof are but one entity in a court of law. However, we are not here dealing with a similar vertical corporate organization. Rather, the conspiracy alleged among the Seagram divisions, and others, relates to the activity of business entities on the same level of the corporate structure. The question presented is whether each business division may be considered a separate legal entity capable of conspiring.

This was also recognized in Reines Distributors, Inc. v. Admiral Corporation, 256 F.Supp. 581, 583 (S.D.N.Y.1966), where the issue was whether a division can be a purchaser or customer under Sections 2(a), (d) and (e) of the Clayton Act, as amended by the Robinson-Patman Act (Title 15 U.S.C. § 13). There the court stated that "substance rather than form should govern" [9], and considered the intracorporate relationship to determine whether the division was in fact a separate business entity. In concluding that the division was not a purchaser or customer the court found that its operation was interlocked with and controlled by the "corporate" entity.

The factual conclusion that a division has independence of action in the relevant business activity is critical to a determination that the division is legally capable of conspiring [10]. As stated in *Standard Oil*, supra, Section 1 of the Sherman Act is "all-embracing", and covers "every" combination which restrains trade, regardless of the form employed. The trial court must consider the peculiar facts of any given litigation in deciding if the division involved is a separate entity in the context of the charge in which the conspiracy is alleged.

In *Nelson*, supra, the court's opinion, and its statement that a person cannot conspire with himself, were founded on the facts as they *there* occurred. We, as judges and lawyers, should not be restricted by the semantics chosen to describe a particular factual situation. Historically and legally a corporation has been deemed a person—and normally so personified as if a man, a creature with but one brain, one medium of thought and action—and this is the concept applied by the court in *Nelson*, and followed in *Poller, Deterjet, Kemwel* and *Johnny Maddox Ford*.

But are all corporations, in fact, "persons", each with one brain, one nerve center, at which all decisions are reached? It is well settled that in corporate structures which consist of a parent corporation and incorporated subsidiaries, each entity is capable of conspiring. There, we have no difficulty in envisioning separate and independent conspirators, regardless of whether the intracorporate arrangement is vertical or horizontal.[11] The question, then, is what, if any, magic occurs when the paper partition is removed. Is a business group which chooses to organize as a single corporation with unincorporated divisions automatically cast in the form of a normal person? Or may we have a corporate "person" in the form of a multiheaded Siva, or as portrayed by Dali or Artzybasheff?

▮ Thus, whether a division is capable of conspiring depends on the peculiar

---

**2.** See also United States v. Yellow Cab Co., 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947) (an antitrust action in which the court found a conspiracy among a corporation and its subsidiaries).

**10.** A division may be given authority to make final decisions in some, but not all, areas of its operation. The situation extant in that phase of the operation under attack is the pertinent factual inquiry.

**11.** United States v. Yellow Cab Co., supra, n. 9; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Timken Roller Bearing Co. v. United States, supra, n. 7; Phi Delta Theta Fraternity v. J. A. Buchroeder & Co., 251 F.Supp. 968 (W.D.Mo.1966).

facts demonstrated. Is each facet of the unincorporated division's operation in fact, for all purposes, controlled and directed from above, or is it endowed with separable, self-generated and moving power to act in the pertinent area of economic activity? This is the key question. If the division operates independently in directing the relevant business activity, then it is a separate business entity under the antitrust laws.[12] There is nothing sacrosanct about the "unincorporated" aspect of corporate divisions. To hold otherwise would give businessmen the power to avoid the proscriptions of the antitrust laws by the fortuitous employment of alert legal counsel.

The Supreme Court "has emphasized in the past that * * * differences in form often do not represent 'differences in substance.' Simpson v. Union Oil Co., 377 U.S. 13, 22, 84 S.Ct. 1051, [12 L.Ed.2d 98]. Draftsmen may cast business arrangements in different legal modes for purposes of commercial law, but these arrangements may operate identically in terms of economic function and competitive effect. It is the latter factors which are the concern of the antitrust laws." [13]

## II. THE HOUSE OF SEAGRAM CORPORATE STRUCTURE

The House of Seagram is a wholly-owned subsidiary of Joseph Seagram and markets "various brands of alcoholic beverages imported by it, or purchased * * * from its manufacturing parent corporation" [14] through seven unincorporated sales divisions. Among those divisions are Calvert, Four Roses and Frankfort, each of which is managed by officers who bear the titular designations of the particular division represented. The House of Seagram has the position of president, which has apparently been filled on occasion, but has remained unoccupied for at least the last two years. The Calvert division is headed by a president, Mr. Arthur Murphy; Four Roses is headed by a president, Mr. Jack Wishny; and Frankfort is headed by an executive vice-president, Mr. Roy Flint.[15]

Prior to July 31, 1954 alcoholic beverages manufactured by Joseph Seagram were distributed in the United States by a group of wholly-owned subsidiaries. At that time the Seagram group of companies underwent a corporate reorganization, with each of the domestic sales subsidiaries becoming divisions of a newly formed corporation known as Distillers Distributing Corp. Pursuant to this reorganization the Calvert Distillers Corporation, for example, became the Calvert Distillers Company, a division of the Distillers Distributing Corp. The latter corporation was subsequently renamed The House of Seagram, Inc., defendant herein.[16]

This organizational juggling by the Seagram companies apparently resulted from the Supreme Court's decision in Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., supra, n. 11, 340 U.S. at 215, 71 S.Ct. 259, 261.[17] In that action

---

12. See dissenting opinion in Poller, supra, 284 F.2d at 607: "In my view, CBS could conspire with CBS-TV, a wholly-owned, but not incorporated, 'division' —as separate and distinct an organization as a wholly-owned subsidiary."

13. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249, concurring opinion of Mr. Justice Stewart (June 12, 1967).

14. Memorandum of Defendants Joseph E. Seagram & Sons, Inc. and The House of Seagram, Inc., filed March 3, 1957, at 2.

15. See Seagram Exhibit No. S–17.

16. See United States v. The House of Seagram, Inc., 1965 Trade Cases at 81,-269, 81,270, para. 71, 517 (a government action to enjoin resale price maintenance of Seagram brands in Southern Florida).

17. Seagram's present counsel has stated that the Court's decision in Kiefer-Stewart precipitated Seagram's change to the divisions organization. This is reflected in the following colloquy with the court, which occurred at the close of plaintiff's case, during argument on defendants' motion for a directed verdict (TR. April 19, 1967):

"THE COURT: Now, I notice in Kiefer-Stewart vs. Seagram and Sons,

a wholesale liquor distributor charged that two of the Seagram sales subsidiaries had conspired to set wholesale prices. The Court rejected defendants' contention that subsidiaries of a common parent can not conspire with each other:

> "Respondents next suggest that their status as 'mere instrumentalities of a single manufacturing-merchandizing unit' makes it impossible for them to have conspired in a manner forbidden by the Sherman Act. But this suggestion runs counter to our past decisions that common ownership and control does not liberate corporations from the impact of the antitrust laws. E. g. United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010. The rule is especially applicable where, as here, respondents hold themselves out as competitors."

Although Seagram changed the form of its corporate structure following *Kiefer-Stewart,* there was no substantive change in the marketing technique employed.

There is nothing wrong with reorganizing to comply with court rulings. However, to avoid the judicial proscription the reorganization must be more than a shuffling of papers. Courts are concerned with applying rules of law in an actual, factual context. Private parties can not evade the applicable law merely by changing the label attached to a particular business entity.

The relationship between the various divisions of The House of Seagram, and the House of Seagram and Joseph E. Seagram & Sons, was stated by Mr. Edgar Bronfman, President of Joseph E. Seagram & Sons, Inc., the parent corporation.

[MR. BLECHER, counsel for plaintiff]:

"Q Do the respective heads of The House of Seagram companies report directly to you, Mr. Bronfman?

"A In a manner of speaking, yes.

"Q Would you explain that further?

"A Well, we run a pretty autonomous operation, and the heads of the companies pretty well run their own shows. They keep me informed or posted on what is taking place, but they don't report to me for direction. We sort of have what you call a General Motors type concept here.

\*      \*      \*      \*      \*      \*

"Q To what extent do your day-to-day activities involve you in marketing of Seagram-produced products?

"A Well, to the extent that I take a pretty close look at the advertising. Beyond that, very little.

"Q I take it from that answer you leave the marketing activities reside pretty autonomously with the heads of the various marketing companies?

"A That's right.

\*      \*      \*      \*      \*      \*

"Q At or about or even following the assignment by you of the distribution [of Hawaiian Leilani Rum] to the Calvert division did you discuss with Mr. Murphy, in terms of distributors, who should handle the distribution of the rum?

340 U.S. 211 [71 S.Ct. 259, 95 L.Ed. 219], we have here the same company, the defendant Seagram and Sons. It would appear to the Court as an inference only—just for the purpose of this discussion I will take this inference—that excellent counsel advised Seagram to tear out the veil of corporate ownership; nevertheless, keep your divisions just as 'independent' as they were before, keep them as competitive as they were before, but tear out the veil, and then we will have cured the defect found in our organizational setup, as pointed out by the U. S. Supreme Court in Stewart.

"MR. ANTHONY [counsel for Joseph E. Seagram & Sons, Inc. and The House of Seagram, Inc]: That is correct."

**922**

"A   No, sir.

\*   \*   \*   \*   \*   \*

"Q   What is the relationship in terms of pricing policies or choice of distributors between The House of Seagram and Joseph E. Seagram and Sons, Inc?

"A   Well, there is no relationship.

"Q   In other words, Joseph E. Seagram and Sons, Inc. does not get into that province at all?

"A   No." [18]

These facts were echoed by Mr. Jack Yogman, the Executive Vice-President of Joseph E. Seagram & Sons:

"Q   What connection, either in staff or line responsibility, have you had with the marketing of products?

"A   Very little.   I am aware of what is going on, but the heads of the sales companies report directly to the president.   My functions with the sales heads of course have been extensive in, say, market research, in packaging, in product, things of that nature.

"But as far as the specific marketing function, they perform that themselves and report to the president.

"Q   What do you understand to be the nature, if any, sir, of the relation between the marketing divisions or the sale companies?

"A   Between them?

"Q   Yes, sir.

"A   Well, it is pretty well designed along the General Motors setup, where they are independent sales divisions, in the sense that they compete, the same as Pontiac competes against Buick and they both compete against Oldsmobile. They are self-contained units. They have their own products. I think they fight each other as hard as they fight anyone else.

\*   \*   \*   \*   \*   \*

"Q   Do the heads of the various House of Seagram companies customarily report to you about a change in distributors?

"A   Not at all." [19]

\*   \*   \*   \*   \*   \*

Mr. Arthur Murphy, President of Calvert, gave the following description of the relationship between the Seagram divisions:

"Q   Now, is it correct, sir, that each of the separate unincorporated divisions of the House of Seagram was charged with the responsibility of marketing certain designated brand-named products?

"A   Correct.

"Q   And most of the products they market are distilled by Joseph E. Seagram and Son or one of the affiliated Seagram companies?

"A   Correct, sir.

"Q   Now, is it also correct, sir, that each of these divisions has a group of officers such as president, like yourself, or in some instances an executive vice-president, and so forth down the line?

"A.   Yes, sir.

"Q   And each have their own chain of command with offices in different places in the United States and different people to man them. is that correct?

"A   Yes, sir.

\*   \*   \*   \*   \*   \*

"Q   Now, is it a fact, sir, that the various unincorporated divisions. for example, Calvert and Seagram Distillers Company, and Four Roses and Frankfort, actually are in competition with each other in selling the various whiskies through distributors throughout the United States?

---

18. Deposition of Edgar M. Bronfman, dated March 3, 1966 at 4–6, 18, 26, introduced into evidence on March 29, 1967.

19. Deposition of Jack Yogman, dated March 3, 1966 at 4–6, 18, introduced into evidence on March 29, 1967.

"A Correct.

"Q And that you wouldn't move over and let Four Roses, you wouldn't accommodate them in any meaningful competitive way and you wouldn't expect them to do that for you?

"A No, sir, I would not.

"Q Now, is it correct that each of these divisions, through its own management, makes the decision as to who will be the distributors in any area?

"A That's correct, sir.

  \*    \*    \*    \*    \*    \*

"Q That is because each one looks at the circumstance and makes its decision independent of the others, is that correct?

"A That's correct.

"Q Now, is it also true, sir, that each division makes a determination for itself as to promotions that are going to be made, advertising campaigns, that sort of thing?

"A This is my responsibility.

"Q And as head of the division, and your counterpart heads, do they make the determination as to the price or prices throughout the country which you are going to charge to wholesalers for the products?

"A Correct." [20]

These "self-contained", "independent sales divisions" are responsible for establishing distribution systems to market the various products entrusted to them. This responsibility includes the choice of one or more wholesale distributors to represent the products in a given geographic area. Each division individually selects the distributor for its products, and decides when a change in distributorship would be appropriate.

The decisions of Four Roses,[21] Frankfort[22] and Calvert[23] to terminate Hawaiian Oke were made by the authorized personnel in each division. Normally such decisions are made "entirely independently"[24] of any other division. If these autonomous divisions deviated from their normal procedure, so that separate, decision-making "heads" acted in concert, they became subject to the proscriptions of the antitrust laws.

While reserving its position that divisions of a single corporation are legally incapable of conspiring among themselves, Seagram has pointed to a variety of factors which allegedly preclude a factual finding that these divisions were independent. The dialogue between court and counsel which followed the court's oral ruling on Plaintiff's Proposed Instruction No. 36 sets forth these factors:

"MR. ANTHONY: The court has said that the divisions of Seagram operate independently. That is confined solely to 'the matter of sales. All billings, all accounting, payrolls, checks, everything of that nature is done through the one corporation. There is no such independence of operations as your Honor has assumed in the oral decision given prior to the recess. In other words, these are simply sales divisions.

  \*    \*    \*    \*    \*    \*

"Next, your Honor has neglected to recognize the clear evidence in this

20. TR. April 19, 1967.

21. Deposition of Jack Wishny (President of Four Roses), dated March 2, 1966, at 11–12, introduced into evidence on March 31, 1967. Deposition of Edwin D. Kaufman (Western Division Manager of Four Roses), dated January 17, 1966, at 14, introduced into evidence on April 3, 1967.

22. Deposition of Roy Flint (Executive Vice-President of Frankfort), dated March 2, 1966 at 7, 10, introduced into

evidence on April 4, 1967. Deposition of Joseph E. Flick (Western Division Manager of Frankfort) dated January 17, 1966 at 12, introduced into evidence on April 4, 1967.

23. Deposition of Gerald J. Novak (Western Division Manager of Calvert), dated January 17, 1966 at 37, introduced into evidence on March 31, 1967.

24. Id. at 33.

924

case, namely, that the plaintiff dealt with the House of Seagram, Inc. The very contract is in the name of the House of Seagram, Inc., through its respective divisions.

&ast; &ast; &ast; &ast; &ast; &ast;

"THE COURT: I was aware that the evidence showed, and &ast; &ast; &ast; the Court &ast; &ast; &ast; accepted the fact that the evidence showed that the organizations, each division, were sales organizations; they were sales divisions.

"MR. ANTHONY: Only &ast; &ast; &ast; Sales only.

&ast; &ast; &ast; &ast; &ast; &ast;

They don't even have bank accounts, these divisions, your Honor. They didn't even employ advertising agencies. All of these functions are done by the House of Seagram, Inc., all of the accounting, all of the banking, all of the employment. &ast; &ast; &ast; And so what I respectfully say to your Honor is that this decision that was announced prior to the recess should be founded upon the single proposition that they had separate sales organizations, the functions of which were confined to sales." [25]

### III.  CONCLUSION

 Counsel's observation that the court's decision is "founded upon the single proposition that they [the divisions] had separate sales organizations" is accurate. Plaintiff charged a conspiracy to terminate it as defendant's sales representative in Hawaii. The distribution of defendant's products is the only business function which is relevant herein. The fact that the Seagram divisions may have certain joint or common functions does not detract from the admittedly divided responsibility for marketing. Plaintiff's allegations related to defendant's sales organizations. This is the only activity which must be considered in determining each division's status as a separate legal entity capable of conspiring. Defendant has acknowl-

edged that each division has individual responsibility for establishing its own distribution system. Seagram chose this form of business organization for reasons sufficient unto itself. Having made the divisions separate and independent for this particular economic function, defendant cannot now escape the legal impact of its action. The court finds that Four Roses, Frankfort and Calvert are each distinct and separate, operating, marketing entities, legally and factually capable of entering into the conspiracy alleged.[26]

25. TR. April 20, 1967.

26. The jury found a conspiracy among all named defendants.